RAMSEY COUNTY COMMUNITY HU-
MAN SERVICES DEPARTMENT,
Appellant,

v.

Pablo DAVILA, Respondent.

No. C1–85–687.

Supreme Court of Minnesota.

May 23, 1986.

Rehearing Denied Aug. 1, 1986.

Tom Foley and Michele L. Timmons, Ramsey Co. Attys., St. Paul, for appellant.

Theodore J. Collins, Mark W. Gehan, Jr. and John R. Schulz, St. Paul, for respondent.

SCOTT, Justice.

Ramsey County sought to discharge a veteran, Pablo Davila, for violating several civil service rules. After conducting a veterans preference hearing, the Ramsey County Civil Service Commission (Commission) concluded that Davila had in fact violated the rules as alleged and that such violations were cause for discharge. The Commission, however, modified Davila's discipline, suspending him for six months and making his return to a demoted position contingent upon therapy. On appeal, the Ramsey County District Court ruled that the Commission exceeded its statutory authority in modifying the discipline, and ordered the Commission to discharge Davila. The Minnesota Court of Appeals, in a split decision, reversed the district court, concluding that the Commission acted within its statutory powers. We now affirm in part and reverse in part the decision of the appeals court.

In 1966, Pablo Davila was hired as a caseworker in the Ramsey County Community Human Services Department. Davila worked as a caseworker until 1968, when he took a leave of absence to complete a master's degree in social work. He returned to the department in 1970 and eventually was promoted to a supervisory position. Later, he assumed the title of Supervisor II, a position that was reclassified as Welfare Manager in 1974, when all employees in the department came under the Ramsey County Civil Service System.

On February 27, 1984, the Department notified Davila by letter of its intent to discharge him effective May 1, 1984. Alleging that Davila had sexually harassed co-employees, the Department charged him with "gross misconduct" as well as with violating several civil service rules. The Department informed Davila of his right to request a hearing under the Veterans Preference Act. Davila exercised his right and a hearing commenced on April 24, 1984, before the Ramsey County Civil Service Commission.

Witnesses appearing before the Commission included several female employees who testified about the sexual harassment they experienced while working with Davila. Dorothy Uhler, a secretary for the State Services for the Blind, testified that Davila's office was located in the same building as hers during 1981 and that Davila, upon meeting her for the first time, put his hand on her arm. Later, he came into her office, stood close to her, and asked her questions about her personal life. She testified that during this incident she felt trapped and was intimidated by Davila.

Darlene Aliperto, a Department employee, testified that she first met Davila in 1980 when she worked in the Department's child protection unit. She told the Commission:

Well, every time I would see him in the hall he would come up to me and when it—At the beginning he would just put his arm around you and squeeze you and, you know, ask how you were doing and that sort of thing, and, oh, I haven't seen you in a while. As time went on his hands started moving other places instead of the arm. Next it was around your waist and then all of a sudden there were times where he would grab you, it was like he was trying to grab you around your waist and his hand would accidentally slip up or slip down. And there were times where he would come right out face to face with you and grab you and squeeze your whole body up against his and rub himself up against you.

Aliperto testified that the physical and verbal harassment continued into 1981, when Davila became her supervisor. On one occasion, Davila asked her to have an affair with him. Aliperto testified that she declined, and the following Monday she was informed by Davila that her position was being eliminated due to budget cuts. She believed that Davila selected her position for elimination because of her refusal to have an affair with him. Aliperto ultimately retained her position. The sexual harassment continued, however, and in 1982 Aliperto informed the affirmative action office of Davila's conduct. She wished

to remain anonymous, and thus the county did not formally investigate the allegations raised.

Alice Jones accompanied Aliperto to the affirmative action office in 1982 to also inform that office of Davila's offensive behavior. In 1979, Jones began working for the Department as a mailroom clerk. She told the Commission that, while still a probationary employee, she was on an elevator taking a mail cart to an upper floor one day when Davila got on the elevator and trapped her between himself and the elevator door. She also testified that on another occasion Davila was coming toward her in a hallway when, upon approaching her, he grabbed her arm and pulled her into an alcove where he kissed her. She testified that she ran out of the alcove, but was too frightened to report this incident, or the elevator incident, to her supervisor.

In October 1983, Jones applied for a different clerical position in the Department. On a Friday she was offered the position for which she had applied; however, on the following Tuesday she was informed by the person who had initially offered her the position that someone else would have to be hired. She testified that soon thereafter Davila approached her and said that he hoped there were no hard feelings about her losing the job. She stated that he then told her, "You do know that we have to play ball here." Jones took the statement to mean that she was not "playing ball" with him and as a result did not get transferred to the position she desired. Jones testified that sometime later she was standing by the bulletin board on which job openings were posted and heard someone say, "You might as well quit looking." When she turned around, the only person in the vicinity was Davila.

Virginia Reher, a Department employee since 1960, also testified at the hearing. She stated that although she worked in the same unit with Davila from 1973 to 1976, she never saw him physically touch another female employee, nor did he ever inappropriately touch her. However, in 1978 Davila returned to the unit in which Reher worked, and Reher testified that in August of that year Davila entered her office to apologize for a heated discussion that had taken place between them the previous day. Upon getting up to leave, Davila kissed Reher on her lips. Reher testified that in 1983, during a discussion on a work-related problem, he once again kissed her.

Another employee, Michelle Dodds, also testified to the sexual harassment she experienced in the Department. She testified that in 1978, Davila began approaching her at her desk. The transcript reads:

Q. What was this conduct?

A. As I sat at my desk he would sit on my desk facing me right there. And then he would start talking in my ear and then gradually get closer and closer and I would have to move away like this (indicating), way over like this.

Q. How low would you be then?

A. I would be way like this (indicating). People would observe and say that it looks as though he's raping you.

Q. People made that comment to you?

A. Yes.

Q. How did this make you feel, Michelle, when he was leaning over you like this?

A. Miserably uncomfortable.

Q. Approximately how many times did he lean over you as you have just demonstrated?

A. This extended about six times.

Dodds testified that during this time Davila would ask her about her sexual relationships with other men and ask her to have sex with him. She stated that in 1979 she confronted Davila, warning him to stop sexually harassing her. Thereafter, Dodds transferred to a different unit of the Department, but in 1983 returned, at which time, she testified, Davila began staring at her and following her around. She stated that he also began sitting at her desk at work and telephoning her at home. In 1984, she resigned her position with the Department. Dodds told the Commission

that she left the department because of Davila's continued harassment.

Mary Tekautz also testified before the Commission. She stated that she first experienced harassment in 1977 when, during working hours, Davila kissed her on the cheek and said to her, "You know what you need is a good affair." Such conduct, Tekautz stated, was unsolicited on her part. The harassment continued, she testified, throughout 1981. Davila would put his arm around her while she was seated at her desk. He would, she testified, tell other employees, "Mary can get anything she wants from me." On Christmas Eve 1982, Tekautz stated, Davila asked her for a hug. She consented, but instead of giving her a hug, he gave her a "long, very sensual kiss on the lips." Thereafter, she told the director of the Department of the incident. The transcript reads:

> I decided that if I was going to be anything but a victim, I needed to confront him eyeball to eyeball. But while I have never had any kind of retaliation or—I don't know—revenge or whatever you want to call it from him, many people that I talked to told me that I had best watch myself. So I felt that I needed some protection. I approached the director of our agency, Mr. Faschingbauer, told him of the incident; told him I did not want to seek therapy; asked him to hold this confidential because I did not want to begin a formal harassment complaint; that I wanted to confront him myself. But should everyone's rumors be confirmed about his getting back at people, I would then ask Mr. Faschingbauer to remember this conversation because I did not want my source made known.

Tekautz then approached Davila:

> I can't recall the exact words but I know that I told him I was very disturbed by the incident at the Christmas party, that it did not feel friendly but rather it felt very sensual and very sexual and very unappropriate [sic] and that I did not want him talking with me in a sexual manner, touching me in any way or anything else that was sexual. And that if

he did not stop, I would have to carry it further.

Tekautz testified that except for one incident in which he made a sexual innuendo, Davila ceased his sexual harassment of her.

Melissa Hathaway, a social worker in the Department, also testified at the hearing. She stated that she first met Davila in 1978. At that time Davila would frequently stop at her desk, put his arm around her, place his head next to her cheek, and stroke her hair. This conduct, she testified, continued into 1979, when Davila became her supervisor. In late 1979, Hathaway told him that his behavior was embarassing and that it made her feel uncomfortable. Hathaway testified that despite her plea, the harassment continued. In 1980, she began documenting Davila's actions, which included placing his arm around her waist, touching her breasts, hips and buttocks, and putting her hand on his lap.

The harassment, she testified, continued into 1981, 1982, and 1983. The transcript reads:

> Q. Ms. Hathaway, in 1981, were you still discussing Mr. Davila's behavior with him at that time?
>
> A. I discussed it with him, yes, through 1981, '82, '83 constantly.
>
> Q. And how was Mr. Davila reacting to these talks?
>
> A. Well, he would agree at times that, yes, it was, you know, he would stop, but make me feel better. But he always added, but, you know, that you are not meeting your needs and you should really meet your needs and, you know. No one man can ever meet your needs.
>
> Q. And, Ms. Hathaway, did you continue to be made physically sick by his behavior?
>
> A. Yes.
>
> Q. Did that change in any way over 1980, '81 and 1982?
>
> A. Well, I just felt worse. It was more frequent. I was sick all the time in

1981. Every morning—There were mornings I would back out of my driveway and I would think I just can't go to work. I can't go in that place. I can't look at him. I can't be involved with him and I would drive right back up.

Q. You testified that you were vomiting and that the migraines increased. Any other physical effects that you can think of?

A. That was basically it, just the vomiting and migraines. There were times when I would throw up at work.

Hathaway testified that in 1983 Davila began threatening to transfer her from the child protection unit, which she enjoyed, to the adult mentally retarded unit, which she had previously told him she would not enjoy. She stated that Davila asked her to have an affair with him and promised that if she agreed he would make her his administrative assistant.

On September 30, 1983, Hathaway sent the following memorandum to Davila:

Since my attempts to address this problem verbally with you on several occasions have not been successful, I am writing this to inform you that I'm not interested in the sexual relationship with you. Your repeated sexual advances toward me both at work and at work-related social situations are causing me a great deal of personal and professional distress and creates an intimidating working environment. I am certain that you can appreciate the seriousness of the situation and that I will not suffer any negative repercussions from this memo. I expect that this communication will enable us to resume our previously satisfactory working relationship.

Thereafter, the Department sent the following memo to Davila:

On Tuesday, October 4th we met with you to discuss Melissa Hathaway's memo to you in which she advised you that your repeated sexual advances towards her were causing her personal and professional distress and creating an intimidating working environment for her. We advised you that beginning immediately you should initiate no further contact with Melissa Hathaway. You should not go by her and you should not talk to her. All supervision of Melissa Hathaway will be provided by Bill Barrett. You will continue to supervise Bill Barrett as usual. Because of the serious nature of this matter we must advise you that it would be necessary to take disciplinary action should these instructions be violated.

Hathaway told the Commission that Davila violated the instructions detailed in the Department's memorandum. She stated that even after it was sent he would walk past her desk and smile at her, laugh at her, or ask her how she was. Hathaway transferred to the Mental Health Department in December 1983.

At the hearing, the Commission heard much testimony concerning whether Davila was adequately informed that his behavior constituted sexual harassment and that the continuation of such conduct would result in discipline. Davila testified that in 1981 he attended a meeting on sexual harassment, a meeting that was mandatory for all supervisors and managers in the Department. He also testified that in 1981 he read an article on sexual harassment in the Department's weekly newsletter and in 1983 he attended in-service training on sexual harassment. He told the Commission, however, that he considered the meeting, in-service training and article as pronouncements of general departmental policy and not as specific directives aimed at himself. Davila pointed out that in 1978, when Tekautz told him she was uncomfortable with his behavior, he ceased such activities. He also stated that in 1983, when Hathaway sent him the memorandum urging him to stop his conduct toward her, he did. He testified that Aliperto, Jones, Reher and Uhler never approached him concerning his conduct toward any of them. He noted that an evaluation of his performance, conducted in 1981, was very satisfactory and that no one was critical of his job perform-

ance until a written evaluation was conducted in April 1984, an evaluation which was never discussed with him.

Maxine Ohnstad, an employee of the Department who first met Davila in 1969, told the Commission that for some people in the Department it was common to hug one another. Lorelei Libra, who had worked for the Department since 1969, testified that from 1979 to 1981, the period in which he supervised her, Davila would put his arm around her as a way of showing support. She was not offended by this behavior, she testified; she knew he was a person who touched people in an innocent, caring way. Grace Flynn, who worked with Davila periodically throughout her 24 years with the Department, stated that she never heard Davila make any remarks she found offensive. She also testified that Davila never instructed her to eliminate Aliperto's position, as alleged by Aliperto. Patricia Pfundstein, a Department employee since 1975, testified that, for some time, her desk was located directly outside of Davila's office and that she was never offended by any of his actions.

On September 11, 1984, after hearing the testimony of 29 witnesses, the Commission made its findings and issued its order. It stated: "On numerous occasions involving subordinate female employees Mr. Pablo Davila engaged in conduct that constituted sexual harassment." It noted that such conduct violated specific civil service rules and thus was cause for discharge. The Commission, however, did not discharge Davila, citing his long tenure with the Department, his poor health, and his age. Instead, the Commission ordered:

> Mr. Pablo Davila shall be suspended without pay from his employment with Ramsey County for a period of not less than six months.
>
> That during the period of suspension, Mr. Pablo Davila will obtain appropriate treatment for the purpose of modifying his behavior so that a recurrence can reasonably be expected not to occur.
>
> That after completion of the period of suspension, Mr. Pablo Davila may be returned to employment with Ramsey County after certification to the Civil Service Commission by his therapist or therapists that it can be reasonably expected that Mr. Davila's behavior, as proved during the hearing, will not recur.
>
> That Mr. Pablo Davila will be reduced from his position and salary as Welfare Manager in the Ramsey County Community Human Services Department to a position and salary of Social Worker I.

Both Davila and the Department appealed the decision of the Commission in Ramsey County District Court. The district court found that the evidence adduced at the hearing amply supported the Commission's finding of misconduct. It ruled, however, that the Commission could not substitute its own disciplinary action in place of the Department's, but instead must either find that the evidence warranted the Department's action, in which case it must affirm the Department, or that the Department's action was unwarranted, in which case it must order reinstatement. Because the Commission determined that the evidence warranted dismissal, it could not, the district court stated, reduce the Department's discipline. The court remanded to the Commission for the issuance of an order of dismissal.

The court of appeals reversed the district court. It held that a determination by the Commission that an employer's action was without just cause is not a condition precedent to reducing an employer's discipline. Thus, the Commission properly questioned the appropriateness of the discharge even though it found just cause for such a discipline. *Davila v. Ramsey County Community Human Services Department*, 374 N.W.2d 547 (Minn.Ct.App.1985).

We granted the employer's petition for further review and now discuss (1) whether the Commission had statutory authority to modify the Department's discipline of Davila, and (2) whether the exercise of that authority constituted an abuse of discretion in this case.

1. The Veterans Preference Act (Act), Minn.Stat. §§ 197.455–.481 (1984), provides

that an honorably discharged veteran holding a position of public employment can be removed from his or her position only for "incompetency or misconduct" proven after a hearing. Minn.Stat. § 197.46. The Act further provides that a hearing for removal be conducted by the established civil service commission in all governmental subdivisions having civil service systems. *Id.* In 1984, when Davila requested that a hearing under the Act be held to determine his misconduct, Ramsey County had a civil service system. *See* Minn.Stat. § 383A.29 (1984). Thus, Davila's veterans preference hearing was conducted by the Ramsey County Civil Service Commission.

Although it conducted the hearing pursuant to the Act, the Commission relied on the county civil service code, Minn.Stat. § 383A.29, to define the parameters of its powers. Subdivision 15 of the code provided, in part:

> After the hearing the commission may, if it considers the evidence to so warrant, affirm the action of the appointing officer, or, if the commission determines the action of the appointing officer to be without just cause, order the reinstatement of the employee, or the commission may, in its judgment, reduce the punishment sought to be applied by the appointing officer to a reduction or suspension.

Relying on this portion of the code, the Commission modified the disciplinary sanction recommended by the Department, ordering that Davila be suspended and demoted, not discharged.

The Act is silent on the issue of whether modifications of disciplinary sanctions may be ordered by a civil service commission conducting a veterans preference hearing. The Act merely provides that a veterans preference hearing be held before a civil service commission; if no such commission exists, the statute provides the method by which a veterans preference board can be established. The authority of the commission or board conducting the hearing is not detailed.

Although the Act does not define the authority of a commission or board con-

ducting a veterans preference hearing, the statute does contain the following provision:

> The provisions of section 43A.11 granting preference to veterans in the state civil service shall also govern preference of a veteran under the civil service laws, charter provisions, ordinances, rules or regulations of a county, city, town, school district, or other municipality or political subdivision of this state, except that a notice of rejection stating the reasons for rejection of a qualified veteran shall be filed with the appropriate local personnel officer. *Any provision in a law, charter, ordinance, rule or regulation contrary to the applicable provisions of section 43A.11 is void to the extent of such inconsistency.*

Minn.Stat. § 197.455 (emphasis added). In *Leininger v. City of Bloomington*, 299 N.W.2d 723 (Minn.1980), we construed this provision of the Act, noting that a section of the Bloomington Home Rule Charter and Merit System Rules conflicted with a state civil service rule, Minn.Stat. § 43.24, subd. 2 (Supp.1979). In conducting a veterans preference hearing in *Leininger,* the Bloomington Merit Board had concluded that, based on its own merit system rules, it had no authority to modify the city's proposed discipline. We held that the city merit board possessed such power because, in light of section 197.455 of the Act, state civil service rules prevail over any conflicting local rules, and a particular state civil service rule (Minn.Stat. § 43.24, subd. 2) allowed the state civil service board to formulate alternative disciplinary sanctions. We stated that "Minn.Stat. §§ 43.24, .30, 197.455, and .46, read together, impliedly authorize the Bloomington Merit Board to fashion a remedy other than that determined by the City, if the evidence presents extenuating circumstances." 299 N.W.2d at 729.

■ Our decision in *Leininger* thus requires a local civil service commission conducting a veterans preference hearing to follow state civil service rules when its own local rules conflict with the state's. One

question, then, in the case at bar is whether any provision of the Ramsey County Civil Service Code, Minn.Stat. § 383A.29, concerning the power to modify a disciplinary sanction, is inconsistent with any state civil service rule. If it is, it falls, and the Commission must adhere to the applicable state civil service provision. Before 1981, a state civil service rule (Minn.Stat. § 43.24, subd. 2) allowed the state civil service board to modify a disciplinary sanction recommended by a public employer. In 1981, the legislature repealed the state civil service system and enacted a comprehensive personnel statute, Minn.Stat. §§ 43A.01–.47 (1984). *See* Act of June 5, 1979, ch. 332, 1979 Minn.Laws 935 (establishing a commission to study the need for a personnel system); Act of May 15, 1981, ch. 210, 1981 Minn.Laws 702 (enacting a personnel system). No provision in the new personnel system specifically refers to a modification of a disciplinary recommendation. *See* Minn.Stat. §§ 43A.01–.47; *see also* Minn.Rules 3900.0100–.9500 (1985) (Rules of Department of Employee Relations). Because no state provision on the subject is evident, no inconsistency under Minn.Stat. § 197.455 is possible. The Ramsey County Civil Service Code, Minn.Stat. § 383A.29, thus controls.

■ The Ramsey County Community Human Services Department maintains that the county civil service code allows the Commission to reduce a disciplinary sanction only if it determines that the action of the public employer is without just cause. Because the Commission in this case determined that the evidence warranted a discharge, the Department argues, the Commission could only affirm the Department's discipline. The applicable provision of the county civil service code provides:

> **Removals and demotions.** (a) No person in the classified service, who is permanently appointed or inducted into the service, may be removed, demoted or discharged except for cause. Removal, reduction or suspension for religious or political reasons is not considered "cause". If an appointing officer desires to demote or discharge an employee he shall present the employee with the charges against him in writing, and file a copy of the charges with the administrator. The accused employee may, within ten days from the date the charges are served upon him, file with the administrator a written demand for a hearing, whereupon the commission shall conduct a hearing without unnecessary delay. *After the hearing the commission may, if it considers the evidence to so warrant, affirm the action of the appointing officer, or, if the commission determines the action of the appointing officer to be without just cause, order the reinstatement of the employee, or the commission may, in its judgment, reduce the punishment sought to be applied by the appointing officer to a reduction or suspension.* If the commission determines that the action of the appointing officer is without cause, it may order the accused employee to be paid his salary during the period he was off duty because of removal without cause.

Minn.Stat. § 383A.29, subd. 15(a) (emphasis added).

The statutory provision is not an example of legislative clarity. It appears, however, that the structure of the sentence in the provision at issue is such that the power to modify a disciplinary action is not dependent on a finding of no just cause. The use of the phrase "the commission may" in the clause granting the power to reduce a disciplinary sanction appears to set that clause apart from the preceding clause, which reads: "After the hearing the commission may, if it considers the evidence to so warrant, affirm the action of the appointing officer, or, if the commission determines the action of the appointing officer to be without just cause, order the reinstatement of the employee * * *." The use of the phrase "in its judgment" also lends some support to the proposition that the commission need not first determine there was no just cause for the public employer's action, in order to reduce the discipline recommended.

Also of some significance is the fact that the legislature, in enacting a new civil service code for Ramsey County in 1985, did not make the power to modify the discipline of the public employer dependent on a finding of no just cause. *See* Act of May 8, 1985, ch. 89, § 13, 1985 Minn.Laws 213, 225–26. The new provision reads, in part:

Subd. 4. **Appeal process.** (a) **Hearing.** Within ten days of receipt of the employee's written notice of appeal, the personnel review board shall request the chief administrative law judge to assign an administrative law judge to hear the appeal. The hearing shall be conducted as a contested case and both the employee and appointing authority shall be entitled to present facts at the hearing. The burden of proof shall be on the appointing authority to establish the basis for its disciplinary action by a preponderance of the evidence. A record shall be kept of the hearing at the expense of the personnel review board. The administrative law judge may subpoena and require the attendance of witnesses and the production of any relevant documents and may administer oaths to witnesses.

(b) **Hearing report.** *Within 30 days after the close of the hearing record, the administrative law judge shall recommend to the personnel review board an appropriate disposition of the grievance which shall be in writing and contain findings of fact and conclusions.*

(c) **Decisions of personnel review board.** *Within 30 days of receipt of the administrative law judge's recommendation, the personnel review board shall act to modify, reject, or accept the recommendation.* If the personnel review board fails to act within 30 days after receipt of the recommendation, it shall be deemed to have accepted the recommendation of the administrative law judge recommending final disposition of the grievance. The personnel review board shall not conduct a hearing prior to modifying, accepting, or rejecting the recommendation of the administrative law judge but shall confine its review to the record established before the admin-

istrative law judge and no party to the appeal shall have a right to a hearing de novo before the personnel review board.

Minn.Stat. 383A.294, subd. 4 (Supp.1985) (emphasis added).

Legislation that grants a civil service commission the power to modify disciplinary recommendations, whether or not it finds the action of the public employer to be without cause, is consistent with the notion that a discharged employee be granted a meaningful civil service hearing. Civil service systems were established to control the unfettered discretion of elected and appointed officials in the public employment selection and retention process. The Ramsey County system is no different; it is a procedural safeguard against abuses of power. The legislature, in enacting the civil service code at issue here, did not contemplate that the Ramsey County Civil Service Commission "serve merely as a body which reviews findings by appointing officers or department heads." *City of Minneapolis, by Johnson v. Singer,* 253 N.W.2d 150, 151 (Minn.1977). The power, in all cases, to accept or reject an employer's disciplinary recommendation is a meaningful part of the Commission's role in the county civil service scheme. *See Essling v. St. Louis County Civil Service Commission,* 283 Minn. 425, 428, 168 N.W.2d 663, 665 (1969) ("A [civil service] commission can exercise only such authority as is legally conferred by express provisions of law or such as, by fair implication and intendment, is incident to and included in the authority expressly conferred for the purpose of carrying out and accomplishing the objectives for which the commission was created.")

2. The legislature, in enacting a civil service system to control the unfettered discretion of public employers, did not intend to place total discretionary power in a civil service commission. Recognizing that civil service commissions, like public employers, could abuse their power, the legislature included the following provision in the Ramsey County Civil Service Code:

An officer or employee may appeal from the decision of the commission to the district court of Ramsey county, which court shall determine *whether the record of the hearing contains evidence upon which the commission could have reached its decision and whether the commission abused the discretion granted it.*

Minn.Stat. § 383A.29, subd. 15(a) (emphasis added).[1]

■ The Commission's exercise of its power to reduce a disciplinary sanction must be a proper discretionary act. After conducting a hearing, the Commission must make detailed findings that in fact warrant a modification of the discipline recommended by the public employer.

■ In its only statement concerning the appropriate discipline for Davila, the Commission noted: "[T]hough Mr. Pablo Davila's record of long service, his age and personal health do not mitigate the proved charge against him they are relevant in the setting of an appropriate penalty." The Commission did not discuss how Davila's age, poor health, or long tenure warranted a reduction in the disciplinary sanction recommended by the Department.

Although factors such as an employee's age, health, and tenure of service may be considered by a veterans' preference commission or board in determining the appropriate discipline for an employee, based on the record before us in this case these factors are clearly insufficient to permit any discipline less than discharge. Davila's behavior was so egregious and continued for such a length of time that the factors the Commission listed as mitigating do not warrant a reduction of discipline. The Commission's action was a clear abuse of discretion. The Department's discipline therefore stands.

We affirm the decision of the court of appeals insofar as it held that the Commission's statutory power to modify discipline was not dependent on a finding of no just cause. However, we reverse the appellate court's holding that the matter be remanded for an order affirming the Ramsey County Civil Service Commission's ruling. Under the facts of this case, the Commission's ruling was not a proper exercise of its power and accordingly must be reversed. The employer's recommended discipline of discharge is reinstated.

Affirmed in part, reversed in part.

---

1. This provision also provides that an appeal from a civil service commission order may only be taken to the district court and that the decision of the district court is final. Because in this case the Commission was conducting a veterans preference hearing, the appellate review of its order is governed by the Veterans Preference Act, which does not contain a similar restrictive appellate review clause. Thus, Davila could properly appeal the district court judgment.