**Russell W. ANDERSON, Respondent,**

v.

**POLICE CIVIL SERVICE COMMIS-SION OF the CITY OF WILLMAR, et al., Petitioners, Appellants.**

No. C4–86–1598.

Supreme Court of Minnesota.

Oct. 23, 1987.

Richard L. Ronning, Willmar City Atty., Willmar, for petitioners-appellants.

Eric J. Magnuson, Louise A. Dovre, Minneapolis, DePaul Willette, Olivia, for Russell Anderson.

Thomas L. Grundhoefer, League of Minnesota Cities, St. Paul, amicus curiae.

KELLEY, Justice.

Respondent Russell W. Anderson, an unsuccessful applicant to fill a captain's vacancy on the Willmar city police force, contends that the City of Willmar Police Civil Service Commission violated the police civil service law under which it was organized (Minn.Stat. § 419.01 et seq. (1986)) when it

recommended to the city council a candidate to fill the position after the commission had utilized procedures which he claims impermissibly delegated the Police Civil Service Commission's discretionary powers to persons not members of the commission. In quashing a previously entered temporary order enjoining the appointment and a previously granted writ of certiorari, the district court ruled the procedure followed by the commission comported with applicable statutory requirements. The court of appeals, however, disagreed and remanded the matter to the commission for reinitiation of the selection process, 398 N.W.2d 640. We reverse and remand to the trial court for entry of the order dated August 7, 1986, quashing the writ of certiorari and writ of temporary injunction.

When it enacted 1929 Minn.Laws 377, ch. 299 (now codified as Minn.Stat. §§ 419.01–419.18 (1986)), the legislature authorized cities to establish local police civil service commissions. The enabling act established powers of such commissions and provided rules and regulations generally governing their operation. Pursuant to the authority granted by that statute, in 1956 the City of Willmar by Ordinance No. 070.01 created a Civil Service Police Commission.

For a number of years the City of Willmar Police Department had functioned without an acting police captain. In 1985 city authorities decided to reactivate and fill the position of police captain, who, when selected, would be the second highest officer in the police force chain of command.

The Police Civil Service Commission commenced its duties by first soliciting applications from those interested in the vacancy. In response, it received applications from four Willmar police officers—each then currently sergeants on the Willmar police force. Each application consisted of resumes, containing educational accomplishments, statements of past employment experience on the police force and otherwise, certificates of commendations received, etc. The commission members personally reviewed the written applications and the materials contained therein.

In addition to requiring that each candidate submit an application summarizing such relevant personnel data as education, training and experience, at the inception of the process the Police Civil Service Commission also determined that each applicant would be required to take and successfully pass both an oral examination and a written Civil Service Examination. In arriving at the applicant's total examination final score, the score received on the written examination would be "weighted" 40 percent while the score on the oral examination would be "weighted" 60 percent. Finally, the commission contemplated the applicant receiving the highest combined score would be recommended to fill the vacancy.

The commission neither designed nor modified the standard written Civil Service Examination, but it did request that the Minnesota Department of Employee Relations administer the written test. In fact, Ms. Carol Norum, a certified test administrator, was hired by the commission to administer the written examination. Prior to the actual administration of the written examination, the commission met briefly with the applicants. However, Ms. Norum was the only individual present during the administration of the test itself. None of the commission members actually participated in the gross scoring or in the calculations of the written examination results.

In an attempt to ensure as far as possible that the selection process would be untainted by such subjective elements as localism, favoritism, nepotism, or institutional politics, as well as to be designed to surface the highest qualified candidate possessing the requisite emotional and personality traits to cope with the administrative tasks endemic to the office of police captain, the Police Civil Service Commission investigated various available procedures for administration of an oral examination. It finally concluded those dual objectives could be met best by (1) selecting an interview board composed of three persons geographically far enough removed from the City of Willmar to eliminate the possibility of any personal connections with or knowl-

edge of any of the applicants; (2) that two of the three interview board members should be persons who were or had been officers functioning at the rank of captain or higher in a police department of comparable size so as to be familiar with administrative and personnel qualifications endemic to the position; and (3) that the third member of the board should be familiar with city management inasmuch as some consideration was currently being given in the City of Willmar to the establishment of a city manager form of government. Pursuant to these pre-determined criteria, the Director of Public Safety of Golden Valley, Minnesota, the Chief of Police of Oakdale, Minnesota, and the City Manager of New Ulm, Minnesota, were selected to serve on the oral interview board. Glen Olson, the Golden Valley Director of Public Safety, had some particular expertise in the type of oral testing to be employed and analyzed and he, at least, if not also the other two members of the interview board, had been informed by the Willmar Police Civil Service Commission of its "basic requirements." Apparently under the aegis of Olson, approximately 15 oral interview questions covering the various topics were designed to be used during the oral interview process. Prior to commencement of the interviews, the interview board discussed those questions to some extent, at least, with the commission. In addition to generally approving the topics and questions, the commission, itself, proposed a separate question relating to operation of a police ambulance service—an issue apparently of some community interest in Willmar at the time. Thereafter, as directed by the Police Civil Service Commission, the interview board did interview each applicant, completed the examination answer forms and assigned a numerical score to each applicant based upon his answer to the questions. Each applicant's score for the interview was calculated by the "weighted" factor of 60 percent and, after being added to the "weighted" factor of 40 percent on the written examination, the interview board determined a total score for the entire testing process for each of the applicants.

Following this evaluation, the interview board and the Police Civil Service Commission reconvened. The interview board gave to the commission a summary of numbers assigned to each applicant. From that analysis, the commission was advised that only one applicant had "passed." Indeed, the successful applicant scored higher on both the written and oral portions of the examination than did any of the other candidates. Though commission members among themselves, did discuss certain answers made to the questions by the applicants, the commission, as such, did not review the evaluation forms. The result reached by the interview board that the one candidate who had scored the highest on both the written and oral examination was the best qualified for the office was concurred in by the commission, and he was so recommended.

■ A Police Civil Service Commission, pursuant to Minn.Stat. § 419.05 (1986), has the absolute control and supervision over the promotion of officers of the city's police department. Both Minn.Stat. § 419.06(9) (1986) and Willmar Ordinance No. 070 direct that police promotions should be based upon merit following competitive examination and, as well, "upon records of efficiency, character, conduct and seniority." If a police commission has made a discretionary decision to appoint an officer to fill a vacancy, and if that decision has been made pursuant to those directions, a police commission's decision will not be disturbed by an appellate court absent proof of fraudulent, arbitrary, or unreasonable actions by the commission. *Coudron v. Johnson*, 288 N.W.2d 689 (Minn.1979). In this action the respondent neither contends that the commission's actions were fraudulent, arbitrary or unreasonable, nor does he argue that the selection process was either unfair or not impartial. Minn.Stat. § 419.09 (1986). The respondent likewise concedes that Minn.Stat. §§ 419.05, 419.06, and 419.08 (1986) permit the commission to delegate the responsibility of administering the written examination. Moreover, apparently respondent does not even contend that Minn. Stat. § 419.09 (1986) requires the commis-

sion to personally conduct the employment interviews. However, respondent does assert that in this instance the Willmar Civil Service Police Commission impermissibly delegated so much of its responsibility in the selection of the successful police captain applicant that, in effect, as a practical matter, it abrogated its discretionary authority. He reaches this conclusion by commencing his analysis with the obvious fact that Chapter 419 and Willmar Ordinance No. 070 direct the police commission to create a police officers' promotion system, which, though primarily based on merit and objective factors, nonetheless leaves the commission some discretionary power to render the final promotion decision. The not unusual unrestricted power to promote police officers existing prior to the enactment of the statute and the ordinance, was one of the general powers exercisable by the municipal governing body. Because by statute and ordinance that power has now been substantially delegated to the police commission, he asserts, it is illegal for the commission to redelegate any of the power to an "interview board" by uncritically accepting the recommendation of that board at the crucial stage when the actual selection decision is to be made.

The Civil Service Commission recognizes that certain of its powers are discretionary, and concedes it cannot abandon its responsibilities by delegating them to others. It asserts that in this instance it has not impermissibly redelegated any of its powers —either mandatory or discretionary—to others. It initiated the selection process by carefully structuring it not only to attempt to attract the applications of the best qualified candidates, but also to try to ensure that from that field of candidates the best one qualified on merit alone would ultimately emerge as the successful applicant. To promote that goal it insisted that all applications contain education, and police and career employment records, all which were examined by the commission. It also mandated that each applicant complete an oral examination and a written Civil Service Examination, and it predetermined the "weighting factor" applicable to the scores of each candidate on each test. It familiar-

ized itself with the standard written Civil Service Examination and assured its impartial administration by hiring a state certified test administrator to give the test. In exploring procedures most likely to minimize local subjective influences, it explored various procedures for administrating the oral examination, including some which had been employed in other municipalities in similar circumstances. To further minimize subjective elements such as bias, favoritism, politics, etc., the commission decided to have the oral examination administered by a committee consisting of three experienced persons in public administration chosen from geographically distant, but demographically similar communities. It informed that committee of the commission's basic requirements. Before administration of the oral examination, it reviewed questions contained in the oral examination, and during the course of that review, added another. Finally, it asserts, after receiving the "weighted" scores of both the written and the oral examination it concurred with the committee that the one candidate who had secured the highest score on each the written and the oral portion of the examination was the applicant to be chosen as captain. By taking all of these acts and monitoring the process during the course of the process, the commission maintains that rather than impermissibly surrendering its powers, at all stages of the process the ultimate and final exercise of independent discretion was not only retained by it, but also exercised by it.

These conflicting positions of the parties "point up" some lacunae in the language of chapter 419. The statute's language neither explicitly prohibits delegation of any of the statutory authority given to the Police Civil Service Commissions nor does it specifically mandate that all decisions of all facts of the process relative to personnel matters under the jurisdiction of the Police Civil Service Commissions be made solely by the commission itself. Thus, while Minn.Stat. § 419.06, clauses (2) and (9) (1986) generally state that rules for employment-related examinations be made by the police commission, nowhere does the

statute mandate explicitly that decisions under these rules be made by the commission itself. Similarly, while Minn.Stat. § 419.08 (1986) provides that a police commission "prescribe standards of fitness and efficiency" for each position and that examinations to fill such positions be adapted thereto, it likewise omits to explicitly state, or even imply, that the commission must be the sole body to exercise individual decisions under the prescribed standards. In fact, Minn.Stat. § 419.09 (1986) implies that others than commission members may administer the examination when it says, in part, " * * * The members of the commission collectively or individually *may* act as examiners." (Emphasis supplied). So, too, is Minn.Stat. § 419.05 subject to two different interpretations: on the one hand, its language might be interpreted to require a police commission to retain ultimate authority to reject or accept decisions of, for example, testing groups, or, on the other hand, so interpreted that a police commission must exercise all discretion of whatever nature by exercising it themselves without any delegation at all.[1]

We are provided little direct guidance as to legislative intent from the legislature itself. Nevertheless, it seems perfectly clear that the evil the legislature sought to address in chapter 419 was the pernicious influence of cronyism and partisanship in politics in the staffing of public safety positions in municipalities; and to attempt to eliminate that scourge by providing a system by which these positions could be filled, so far as humanly possible, as a result of merit, competency, training and education. This overriding general intent has been frequently noted in the course of our decisions. *See, e.g., Yaeger v. Giguerre,* 222 Minn. 41, 43–44, 23 N.W.2d 22, 24 (1946); *Naeseth v. Village of Hibbing,*

185 Minn. 526, 528, 242 N.W. 6, 7 (1932); *State ex rel. Kos v. Adamson,* 226 Minn. 177, 183, 32 N.W.2d 281, 282 (1948).

In sustaining the commission, the trial court relied upon *Coudron v. Johnson,* 288 N.W.2d 689 (Minn.1979). The precise issue addressed in *Coudron* differs from the issue before us here. Nevertheless, a number of factual similarities do exist between the two cases. For example, there, as here, the Police Civil Service Commission had employed a predetermined "weighting" factor for the results of the written and the oral examinations. There, as here, the commission members, either as a body or individually, had reviewed such personnel facts as were here included and attached to the applications. The *Coudron* opinion does not specifically discuss the precise examination format employed by use of an investigation board in connection with the oral examination, but, in any event, neither there nor here is that specific use directly challenged.[2]

■ We agree with the trial court that *Coudron* inferentially lends support to affirmance of the Willmar Police Commission's actions in this case. In both instances, the record appears clear that each police commission seriously considered its responsibilities to base the employment decision, insofar as humanly practical, on objective grounds of merit. In both cases, the commissions followed statutory mandates in providing an examination procedure. In both, the commissioners, and the individual members of the commission, commendably were active in overseeing each step of the process. The mere fact that at the end of the process the Willmar commission chose the person who scored highest on both examinations and who was rated the best

---

1. Decisions in analogous contexts go either way. See, for example, *State ex rel. Niemi v. Thomas,* 223 Minn. 435, 439, 27 N.W.2d 155, 158 (1947) (delegated powers cannot be redelegated). *But see Minn. State College Board v. Public Employment Relations Board,* 303 Minn. 453, 465–68, 228 N.W.2d 551, 558–60 (1975) (delegation of the "implementation of its duties" by the State College Board under Minn.Stat. § 136.14 (1969)) is "not a complete divestiture of its supervisory function."

2. *State ex rel. Kos v. Adamson,* 226 Minn. 177, 32 N.W.2d 281 (1948), relied on in part by respondent is inapplicable. The record in *Kos* is replete with egregious acts and omissions of the Rochester Commission. Had this court sustained the Rochester Commission in that case, the beneficent objective of the legislation in enacting chapter 419 would have been completely frustrated.

qualified by the interview committee neither compels the conclusion that the commission impermissibly surrendered its responsibilities to the investigatory committee, nor does it justify an inference that the commission did so when all the evidence surrounding the handling of the matter by the commission and its members is considered in context. From a hindsite vantage point, it is not difficult to spot instances where the commission might have documented its actions so as to leave no residue of even the slightest doubt about the validity of its procedures. Indeed, in future matters Police Civil Service Commissions would be well advised to document their employment actions either by more complete commission meeting minutes or by formal resolutions stating the actual statutory grounds upon which it relied to make its employment decision.[3]

The Willmar Police Commission commendably attempted to institute, monitor, and follow procedures that comport not only with statutory requirements in police employment placements, but also with the underlying intent of chapter 419 that employment and advancement decisions in the public safety area be based upon merit unfettered by personal partiality or institutional politics. Although it delegated portions of the administration of the employment test to others, it retained overall discretion to make the final decision and did so. At all times it retained unto itself the overall discretion to formulate the process so as to comply with the statute as well as the discretion to make all final decisions

encompassed in the procedure including the final selection of the successful candidate. Accordingly, we reverse the court of appeals and remand to the trial court for entry of its order dated August 7, 1986, quashing the temporary injunction and the writ of certiorari.

SCOTT and SIMONETT, JJ., took no part in the consideration or decision of this case.

---

**3.** We do not, however, suggest it is necessary to carry this documentation process to the lengths suggested by the court of appeals. *Anderson v. Police Civil Service Commission,* 398 N.W.2d 640 (Minn.App.1987). The statute requires neither a written record of consideration of all factors listed in Minn.Stat. § 419.06(9) (1986) nor written findings, nor have any of our prior cases. In other public employment contexts where the issue involved is termination of employment as contrasted to employment or advancement, this court has, even in the absence of statutory directive, imposed such requirements. *See, e.g., Morey v. School Board of Independent School District No. 492,* 268 Minn. 110, 128 N.W.2d 302 (1964); *Sellin v. City of Duluth,* 248 Minn. 333, 80 N.W.2d 67 (1956); *Johnson v. Village of Cohasset,* 263 Minn. 425, 116 N.W.2d 692 (1962).

Frequently, a decision to terminate or demote differs from a decision to promote since the former may raise constitutional implications. *See, e.g., Davila v. Ramsey County Community Services Dep't,* 374 N.W.2d 547, 552 (Minn.App. 1985) [modified on other grounds, *see, Ramsey County Community Services Dep't v. Davila,* 387 N.W.2d 421 (Minn.1986) ]; *Rosen v. Minnesota Civil Serv. Bd.,* 295 Minn. 255, 256, 204 N.W.2d 196, 197 (1973). Other instances where we have judicially required written records and formal fact-finding procedures have involved quasi-adjudicative hearings in administrative procedures where such requirements are the norm rather than the exception. *See, e.g.,* Minn.Stat. § 14.50 (1986) (hearings before administrative law judges). *See also* K. Davis, *Administrative Law Treatise* (1980).